IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KEVIN REYNOLDS,                    )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )    Civil Action No. 10-1695
                                   )
COMMISSIONER OF SOCIAL             )
SECURITY,                          )
                                   )
          Defendant.               )

## MEMORANDUM OPINION

## I. INTRODUCTION

Plaintiff, Kevin Reynolds, seeks judicial review of a decision of Defendant, Commissioner of Social Security ("the Commissioner"), denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 401-433 and §§ 1381-1383f.[1]  Presently before the Court are the parties' cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56.  For the reasons set forth below, Plaintiff's motion for summary judgment will be denied, and the Commissioner's cross-motion for summary judgment will be granted

---

[1] The Social Security system provides two types of benefits based on an inability to engage in substantial gainful activity: the first type, DIB, provides benefits to disabled individuals who have paid into the Social Security system through past employment, and the second type, SSI, provides benefits to disabled individuals who meet low-income requirements regardless of whether the individuals have ever worked or paid into the Social Security system.  With respect to Plaintiff's claim for DIB, his earnings record shows that he has acquired sufficient quarters of coverage to remain insured through March 31, 2012.  (R. 11).

## II. PROCEDURAL HISTORY

On May 12, 2008, Plaintiff protectively filed applications for DIB and SSI, alleging disability since August 1, 2005 due to a neurological muscular disorder, back problems, heart problems, high blood pressure, Crohn's disease, lupus or rheumatoid arthritis. (R. 9, 139-53, 207). Plaintiff's applications were denied and he requested a hearing before an administrative law judge ("ALJ"). (R. 65-75, 76-86, 92-94). Plaintiff, who was represented by counsel, testified at the hearing which was held on December 30, 2009. A vocational expert ("VE") also testified. (R. 26-48).

The ALJ issued a decision on January 6, 2010, denying Plaintiff's applications for DIB and SSI based on his determination that Plaintiff retained the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.[2] (R. 9-20). Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on August 17, 2010. (R. 1-5, 136-38). Thus, the ALJ's decision became the final decision of the Commissioner. This appeal followed.

---

[2] The Social Security Regulations define RFC as the most a disability claimant can still do despite his or her physical or mental limitations. 20 C.F.R. §§ 404.1545(a) and 416.945(a).

## III. BACKGROUND

Plaintiff's testimony during the hearing before the ALJ may be summarized as follows:

Plaintiff was born on September 5, 1966.[3] With respect to education, Plaintiff completed the ninth grade. While in school, Plaintiff was placed in remedial math and reading classes.[4] Plaintiff has a driver's license; however, he drives infrequently. (R. 29-30, 42). Between 1993 and 2006, Plaintiff held jobs as a factory laborer and assembler. He also performed janitorial work.[5] (R. 32-33).

Plaintiff is unable to work because he has lupus[6] and Crohn's disease;[7] he requires frequent bathroom breaks;[8] he has constant pain in his feet, legs and back due to arthritis; and he has severe tremors in his hands. Plaintiff takes Trazodone

---

[3] Plaintiff was 43 years old at the time of the hearing before the ALJ. (R. 29).

[4] Although Plaintiff did not graduate from high school, he obtained a General Equivalency Diploma in 1985. (R. 211).

[5] With respect to Plaintiff's employment after his alleged onset date of disability of August 1, 2005, the ALJ concluded that the work did not constitute substantial gainful activity due to the amount of income Plaintiff derived from the employment. (R. 11).

[6] Lupus is an autoimmune disease which means the body's immune system mistakenly attacks healthy tissue. This leads to long-term (chronic) inflammation. Lupus may affect the skin, joints, kidneys, brain and other organs. www.ncbi.nlm.nih.gov/pubmedhealth. Plaintiff testified that as a result of lupus, he gets a rash all over his body when exposed to the sun. (R. 41).

[7] Crohn's disease is chronic ileitis that typically involves the distal portion of the ileum (the last division of the small intestine), often spreads to the colon, and is characterized by diarrhea, cramping and loss of appetite and weight with local abscesses and scarring. www.nlm.nih.gov/medlineplus ("Medlineplus").

[8] Plaintiff testified that he has to use the bathroom about five times a day for 15 minutes at a time due to his bowel condition. (R. 41).

for anxiety and to help him sleep. A side effect of the Trazodone is nausea which Plaintiff experiences several times a week.[9]  (R. 34-35).  Plaintiff also has been hospitalized for chest pain.  (R. 38).

Plaintiff's ability to stand is limited to 45-60 minutes; he can only walk for 25-30 minutes; he experiences numbness in his legs from sitting; he can lift 20 pounds; he has difficulty grasping objects due to the tremors in his hands; he cannot stoop due to back pain; he has difficulty kneeling, crawling, squatting, crouching and bending due to leg pain; his memory, concentration and attention are impaired; and he has difficulty relating to other people at times.  (R. 35-38).

With respect to activities of daily living, Plaintiff, who lives alone, has no problem with self-care, such as dressing, grooming and bathing.  Plaintiff uses a microwave oven to cook. Cleaning is difficult for Plaintiff due to his leg pain. Plaintiff does his laundry, although he sometimes forgets to put the clothes in the dryer after they are washed.  Plaintiff does not sweep or vacuum due to fatigue.  Plaintiff goes shopping with his parents.  Plaintiff's only hobby is listening to music. He does not belong to any clubs or organizations.[10]  (R. 39-42).

---

[9] Trazodone is used to treat depression.  Medlineplus.

[10] In a Function Report completed on June 30, 2008, Plaintiff described a typical day as follows: "Eat breakfast, watch t.v., shower, talk to mom on phone, go see mom and dad talk with them. Eat meals with them, talk on phone. read. Go to store sometimes."  (R. 255).

4

## IV. MEDICAL EVIDENCE

On June 21, 2005, Plaintiff was seen by Dr. Francis Meyers of Chestnut Ridge Primary Care, Ltd., his primary care physician ("PCP") at the time, for complaints of loss of energy, tremors and calluses on his feet that hurt when he stood. Plaintiff also reported increased tension, feelings of restlessness and hyperactivity.[11] Dr. Meyers' diagnoses were "benign essential tremor, worsening" and anxiety, and the doctor prescribed Ativan for Plaintiff.[12] (R. 383-85). In an Employability Assessment Form completed for the Pennsylvania Department of Public Welfare ("PA DPW") that day, Dr. Meyers rendered the opinion that Plaintiff was temporarily disabled (June 18, 2005 to September 18, 2005) due to tremors, fatigue and anxiety. (R. 388-89).

During a follow-up visit on July 11, 2005, Dr. Meyers noted Plaintiff's continuing tremors and described Plaintiff's psychological complaints as "HYPERACTIVE, MILD MOOD SWINGS, FEELINGS OF RESTLESSNESS, INCREASE IN TENSION, INCREASED NERVOUSNESS." Dr. Meyers gave Plaintiff a prescription for Toprol,[13] as well as a new prescription for Ativan. (R. 391-92).

On July 13, 2005, a CT scan of Plaintiff's neck was performed due to the presence of a palpable mass on the left

---

[11] Despite his complaints, during this office visit, Plaintiff informed Dr. Meyers that he exercised "fairly regularly and appropriately for age and health." (R. 383).

[12] Ativan is used to relieve anxiety. Medlineplus.

[13] Toprol is used alone or in combination with other medications to treat high blood pressure. Medlineplus.

side of his mandibular ramus (lower jaw). The impression was described as follows: "Palpable mass corresponds to somewhat prominent superficial lobe of left parotid gland.[14] No evidence of underlying mass lesion." (R. 393).

Plaintiff was seen by Dr. Meyers for a follow-up visit on August 8, 2005. Dr. Meyers noted that Plaintiff's tremors had improved, and Plaintiff was given new prescriptions for Toprol and Ativan. (R. 396). In an Employability Assessment Form completed for PA DPW that day, Dr. Meyers opined that Plaintiff was temporarily disabled (September 8, 2005 to December 8, 2005) due to chronic anxiety and an enlarged parotid gland. (R. 394-95).

On August 18, 2005, Plaintiff was evaluated by Dr. August Sotelo, an otolaryngologist (head and neck surgeon), for the enlargement of the tail of his left parotid gland. Dr. Sotelo's examination of Plaintiff revealed marked inflammation of his ear canals due to chronic cleaning with Q-tips for which the doctor prescribed antibiotics. Dr. Sotelo indicated that if there was no reduction in the size of Plaintiff's left parotid gland in 3 to 4 weeks, he would perform an excision biopsy to rule out a tumor. (R. 397).

---

[14] The paired parotid glands are the largest of the salivary glands. They are each found wrapped around the mandibular ramus, and secrete saliva into the oral cavity to facilitate mastication and swallowing and to begin the digestion of starches. http://en.wikipedia.org

During a follow-up visit with Dr. Sotelo on September 16, 2005, Plaintiff's examination showed that the "firm enlarged mass correspondent to the tail of the left parotid gland went down in size considerably." Dr. Sotelo noted that he would continue to observe the mass.[15]  (R. 400).

Plaintiff was seen by Dr. Meyers for a follow-up visit on October 3, 2005. Plaintiff reported feeling well, and his weight and appetite were stable. Plaintiff indicated that he continued to have tremors, as well as mood swings and increased nervousness and stress levels. Dr. Meyers noted that Plaintiff was in no acute distress; his respiratory effort was normal; his heart rate and rhythm were regular with no murmurs, gallops, rubs or abnormal heart sounds; his deep tendon reflexes were normal and symmetrical; and his motor strength in the upper and lower extremities was 5/5 with mild tremor. Dr. Meyers described Plaintiff's tremor as improved and he continued Plaintiff on the Toprol.  (R. 398).

Plaintiff underwent a disability examination by Dr. Edward Johnson on June 1, 2007, during which he complained of the following conditions: (1) chest pains but no diagnosis of heart disease;[16] (2) diarrhea over the past year which was getting

---

[15] An x-ray of Plaintiff's chest that had been ordered by Dr. Sotelo was performed on November 4, 2005. The impression was described as "normal." (R. 371).

[16] With regard to chest pain, Plaintiff told Dr. Johnson that he had never undergone a stress test or heart catheterization; that his chest pain was not

7

progressively worse;[17] (3) a worsening tremor; (4) back pain and stiffness in the morning; (5) diffuse pain in his lower legs, calves and knees which increased with ambulation; and (6) multiple calluses on his feet which hurt when he walked. Dr. Johnson noted that Plaintiff's past medical history was "significant for the possible diagnosis of lupus."[18] Plaintiff was not taking any medications at this time. (R. 293-94).

Plaintiff's head and neck examination by Dr. Johnson was "unremarkable;" his lungs were clear to auscultation; his heart rate and rhythm were regular; his abdominal bowel sounds were normal; his deep tendon reflexes were normal; his strength was 5/5 throughout; his straight leg raise test was negative bilaterally in both the seated and supine positions; he could walk on his heels and toes; he had no trouble getting on and off the exam table; his gait was normal; and he showed no signs of active synovitis such as joint swelling, redness or warmth.[19] Dr. Johnson indicated that Plaintiff should be evaluated for coronary artery disease, although his atypical chest pain was more likely related to mitral valve prolapse or an underlying

accompanied by diaphoresis (sweating), nausea or shortness of breath; and that the pain did not radiate. (R. 293).

[17] In connection with his complaint of diarrhea, Plaintiff told Dr. Johnson that every time he ate, he had a bowel movement, "up to '70 times a day,'" but that he had not seen a physician for this condition. (R. 293).
[18] As to his possible lupus diagnosis, Plaintiff told Dr. Johnson that his knuckles swell and get red in the morning and he has a rash. (R. 294).
[19] Synovitis is the medical term for inflammation of the membrane that lines joints. Synovitis may occur in association with arthritis, lupus, gout and other conditions. Synovitis causes joint tenderness or pain, swelling and hard lumps called nodules. http://en.wikipedia.org

anxiety disorder; that Plaintiff's diarrhea without weight loss was likely due to irritable bowel syndrome and a gastrointestinal ("GI") work-up was warranted; that Plaintiff's subjective complaints of back pain were not supported by objective findings on examination; that Plaintiff had a tremor of the arm and head; and that, without active synovitis on exam, it was difficult to diagnose Plaintiff with lupus. (R. 294).

Dr. Johnson completed an assessment of Plaintiff's ability to perform work-related physical activities in which he opined that Plaintiff could occasionally lift and carry 50 pounds and frequently lift and carry 25 pounds; that Plaintiff had no limitations with regard to standing and walking, sitting, pushing and pulling (other than shown under lifting and carrying) and no environmental restrictions; that Plaintiff could occasionally bend, kneel, stoop, crouch, balance and climb; and that Plaintiff's ability to handle items was affected by his tremor, although the tremor "likely would respond to treatment." (R. 297-98).

On June 25, 2007, a State agency medical consultant completed a physical RFC assessment for Plaintiff based on a review of his file. In summary, the physician opined that Plaintiff could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; that Plaintiff could stand and/or walk about 6 hours in an 8-hour workday; that Plaintiff

9

could sit about 6 hours in an 8-hour workday; that Plaintiff's ability to push and pull was unlimited (other than shown for lifting and/or carrying); and that Plaintiff had no postural, manipulative, visual, communicative or environmental limitations. In reaching his conclusions, the physician found Plaintiff's statements concerning the limiting effects of his conditions to be "partially credible." (R. 302-08).

On April 21, 2008, Plaintiff presented to the Emergency Department of Latrobe Area Hospital complaining of chest pain.[20] The physician who initially examined Plaintiff noted that he was "very anxious;" that he "supposedly" had a history of Crohn's disease, although the physician could not find any documentation to support the diagnosis; that he had been told "at one time" that he had lupus;[21] that he presented with left-sided sternal chest pain radiating down his left arm, lasting several minutes and associated with diaphoresis, nausea, lightheadedness and shortness of breath; that he reported a 25-pound weight loss

---

[20] The Court notes a significant gap in the medical evidence. Specifically, there are no records showing that Plaintiff received medical treatment between October 3, 2005, when he saw his PCP for a follow-up visit (at which time his physical examination was normal and his tremor had improved), and April 21, 2008, when he presented to the hospital with chest pain - a gap of 2½ years.

[21] With respect to Plaintiff's past medical history, the physician noted: "Again, questionable history of lupus or rheumatoid arthritis, questionable history of Crohn's disease. Not a terribly insightful individual. I am not sure how much of this is actually factual." (R. 312). In this connection, the Court notes that neither lupus nor Crohn's disease is mentioned in the 2005 office notes of Dr. Meyers, Plaintiff's PCP – the only evidence of medical treatment in the record prior to Plaintiff's presentation to the hospital with chest pain in April 2008. (R. 383-85, 391-92, 396, 398-99).

over the last couple of months; that he was not taking any
medications; that he had not seen a doctor in several years; and
that he was a smoker. On physical examination, Plaintiff was
found to be in moderate distress; his lungs were "pretty clear,
although there [were] some coarse breath sounds because of the
smoking history;" his heart had a normal sinus rhythm without
murmurs, rubs or gallops; his bowel sounds were normal; his
neurological exam was within normal limits; and his EKG showed
sinus tachycardia with very little changes.[22]  Plaintiff was
admitted to the hospital for a thallium stress test which ruled
out cardiac etiology for the chest pain.[23]  During his
hospitalization, Plaintiff was evaluated by Dr. C.R. Punukollu,
a gastroenterologist. With regard to physical findings, Dr.
Punukollu noted that Plaintiff was comfortable, in no distress,
awake, alert and oriented; Plaintiff's cardiopulmonary and
abdomen examinations were unremarkable; and Plaintiff's
extremities showed no edema. Dr. Punukollu described his
diagnoses as follows: 1. Noncardiac chest pain, cardiac etiology
ruled out; 2. Strong family history of coronary artery disease;
3. Suspected Crohn's disease; 4. Suspected rheumatoid arthritis;

---

[22] Tachycardia is a faster than normal heart rate.  www.mayoclinic.com.

[23] A thallium stress test is a nuclear imaging method that shows how well blood
flows in the heart muscle, both at rest and during activity.  Medlineplus.
The impression of Plaintiff's thallium stress test was described as follows:
"1. Maximal exercise stress test which is electrocardiographically negative
for ischemia. 2. No exercise-induced chest pain." (R. 338).

and 5. Noncardiac chest pain, rule out gastrointestinal etiology including esophageal ulcer, esophagitis, Barrett's esophagus, gastroesophageal reflux disease or peptic ulcer disease. Upon his discharge from the hospital on April 22, 2008, Plaintiff was advised to take over-the-counter Prilosec on a daily basis for 2 weeks;[24] to see his PCP within the week; and to obtain an upper GI evaluation, a small bowel series and a colonoscopy to confirm the doctor's diagnoses. (R. 309-64).

In an Employability Assessment Form completed for PA DPW on May 6, 2008, an unidentified individual from Chestnut Ridge Primary Care, Ltd. rendered the opinion that Plaintiff was temporarily disabled (April 22, 2008 to April 22, 2009) due to Crohn's disease. The form indicates that the opinion was based solely on a review of Plaintiff's medical records.[25] (R. 452-53).

On May 7, 2008, Dr. Punukollu's office sent a letter to Dr. George Gavin, who succeeded Dr. Meyers as Plaintiff's PCP at Chestnut Ridge Primary Care, Ltd., to advise him that upon Plaintiff's discharge from the hospital on April 22, 2008, he

---

[24] Prilosec is used alone or with other medications to treat gastroesophageal reflux disease, a condition in which backward flow of acid from the stomach causes heartburn and possible injury of the esophagus (the tube between the throat and stomach). Medlineplus.

[25] It is not clear what records the unidentified individual from Plaintiff's PCP practice relied upon to render the opinion that Plaintiff was disabled for a year due to Crohn's disease. At this point in time, there is no evidence of a definitive diagnosis of Crohn's disease. In fact, in a Disability Report completed on June 2, 2008, a month later, Plaintiff noted: "THEY THINK I MAY HAVE CROHN'S DISEASE, NOT YET DIAGNOSED." (R. 245).

12

was advised to schedule an upper endoscopy, a small bowel series and a colonoscopy; and that despite several messages left on Plaintiff's answering machine, he had never returned the calls to schedule these tests. (R. 407).

On May 13, 2008, Plaintiff was seen by Dr. Gavin to follow-up on his recent hospitalization for chest pain. Plaintiff reported chronic diarrhea and a history of Crohn's disease. He also reported a 25-pound weight loss in the preceding 2-3 months. With respect to Plaintiff's physical examination, Dr. Gavin described Plaintiff as a "[h]ealthy appearing individual in no distress," and the doctor noted that Plaintiff's respiratory effort was normal; his heart rate and rhythm were regular with no murmurs, gallops, rubs or abnormal sounds; he had no edema in his extremities; his gait was normal; his cranial nerves were grossly intact; the motor strength in his upper and lower extremities was 5/5; but his Romberg test was positive.[26] Dr. Gavin's assessment included unspecified chest pain, vertigo and abnormal weight loss, and he referred Plaintiff for tests. (R. 410-11).

An MRI of Plaintiff's brain on May 23, 2008 showed no acute intracranial findings. A CT scan of Plaintiff's abdomen and pelvis on the same day was negative for localized inflammatory

---

[26] During the Romberg test, the patient is asked to stand up with the feet together and the eyes closed. If the patient loses balance, this is a sign that the sense of position has been lost and the test is considered positive. Medlineplus.

process or fluid collection and negative for adenopathy.[27]   (R. 367-69).

During an office visit on May 27, 2008, Dr. Punukollu noted, among other things, Plaintiff's history of suspected rheumatoid arthritis and positive lupus screen.  Plaintiff's complaints included chest pain (worse with breathing), joint stiffness, weight loss of 25 pounds in the past 2 months, a decreased appetite and watery diarrhea.  Dr. Punukollu's impressions were (1) noncardiac chest pain, (2) costochrondritis in the lower sternal area,[28] (3) history of Crohn's disease with no work up, (4) diarrhea and weight loss – rule out colitis and colonic neoplasms, (5) history of suspected rheumatoid arthritis, and (6) antinuclear antibody fecally positive.[29]   Dr. Punukollu indicated that several tests would be ordered for Plaintiff.  (R. 415).

---

[27] Adenopathy is the enlargement of lymph nodes anywhere in your body.  Lymph nodes are a part of your immune system and are where immune cells mature to fight illness.  Inflamed lymph nodes often indicate an infection or illness nearby.  www.bettermedicine.com.

[28] Costochondritis is an inflammation of the cartilage that connects a rib to the breastbone (sternum).  It causes sharp pain where your ribs and breastbone are joined by rubbery cartilage.  Pain caused by costochondritis may mimic that of a heart attack or other heart conditions. www.mayoclinic.com.

[29] An ANA test detects proteins called antinuclear antibodies in your blood. Your immune system normally makes antibodies to help you fight infection. The antibodies detected in an ANA test are different.  They may attack your body's own tissues.  A positive ANA test indicates that your immune system has launched a misdirected attack on your own healthy tissue – in other words, an autoimmune reaction.  Because connective tissue is often the target of autoimmune reactions, the resulting diseases are known as connective tissue diseases.  Examples include lupus, rheumatoid arthritis and scleroderma.  www.mayoclinic.com.

Plaintiff underwent a small bowel series for his complaint of diarrhea on June 11, 2008. The impression was described as follows: "Rapid transit, otherwise normal small bowel series." (R. 365). Plaintiff was scheduled for an upper endoscopy by Dr. Punukollu the next day. However, he canceled the appointment due to some family issue.[30] (R. 417).

On July 15, 2008, a State agency psychological consultant completed a Psychiatric Review Technique Form for Plaintiff based on a review of his file. The consultant described Plaintiff's mental impairment as a "HX of Anxiety States." With respect to functional limitations, the consultant opined that Plaintiff had no limitations in activities of daily living and social functioning; that Plaintiff had mild limitations in concentration, persistence or pace; and that the evidence failed to show repeated episodes of decompensation, each of extended duration. (R. 432-44).

On July 23, 2008, a second State agency medical consultant completed a physical RFC assessment for Plaintiff based on a review of his file. The physician rendered the following opinions: Plaintiff could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; Plaintiff could stand

_____

[30] There is no evidence that Plaintiff ever rescheduled the endoscopy with Dr. Punukollu. In fact, there is no evidence that Plaintiff received any medical treatment after June 2008. Thus, at the time of the hearing before the ALJ in December 2009, another significant gap existed in the medical evidence – a gap of 1½ years.

and/or walk about 6 hours in an 8-hour workday; Plaintiff could sit about 6 hours in an 8-hour workday; Plaintiff's ability to push and pull was unlimited (other than shown for lifting and/or carrying); Plaintiff could only occasionally climb, balance, stoop, kneel, crouch and crawl; and Plaintiff had no manipulative, visual, communicative or environmental limitations. (R. 445-51).

On December 1, 2009, a month before the ALJ hearing, Plaintiff underwent a psychological evaluation by Lindsey Groves, PsyD, at the request of his attorney. Following the one-hour clinical interview, Dr. Groves diagnosed Plaintiff with "Generalized Anxiety Disorder" and "Major Depressive Disorder, Recurrent, Severe without Psychotic Features." Dr. Groves noted that Plaintiff's PCPs had been managing his anxiety,[31] and that Plaintiff had never received formal mental health treatment. Dr. Groves described Plaintiff's prognosis as follows: "Highly guarded due to lack of counseling or psychiatric care – may improve if he seeks formal MH treatment." Dr. Groves opined that Plaintiff had an 80% permanent disability, and that he could not engage in employment on a regular, sustained, competitive and productive basis. Dr. Groves assigned a score

---

[31] In this connection, the Court notes that the records of Dr. Meyers show Plaintiff was treated for anxiety in 2005. (R. 383-85, 391-92, 396-97, 398-99). However, the 2008 records of Dr. Gavin do not indicate that Plaintiff complained of anxiety or that he received any treatment from Dr. Gavin for this condition. (R. 381, 410-11).

of 52 to Plaintiff on the Global Assessment of Functioning

("GAF") scale, indicating moderate symptoms.[32]  Dr. Groves

described Plaintiff's limitation in activities of daily living

as "moderate," and his limitations in social functioning and

concentration, persistence and pace as "marked."  Dr. Groves

also indicated that Plaintiff had experienced four or more

episodes of decompensation, each of extended duration.  (R. 455-

65).

## V. ALJ'S DECISION

In order to establish a disability under the Social

Security Act, a claimant must demonstrate an inability to engage

in any substantial gainful activity due to a medically

determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1).  A claimant is considered unable to

engage in any substantial gainful activity only if his physical

or mental impairment or impairments are of such severity that he

is not only unable to do his previous work but cannot,

---

[32] The GAF scale is a numeric scale used by clinicians to report an
individual's overall level of functioning.  The scale does not evaluate
impairments caused by physical or environmental factors.  The GAF scale
considers psychological, social and occupational functioning on a
hypothetical continuum of mental health – illness.  The highest possible
score is 100, and the lowest is 1.  A score of 52 denotes the following:
"**moderate symptoms** (e.g., flat affect and circumstantial speech, occasional
panic attacks) **OR moderate difficulty in social, occupational, or school
functioning** (e.g., few friends or conflict with peers or co-workers).
American Psychiatric Association: Diagnostic and Statistical Manual of Mental
Disorders, Fourth Edition, Text Revision, at 32-34 (bold face in original).

17

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

When presented with a claim for disability benefits, an ALJ must follow a sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). The process was described by the Supreme Court in Sullivan v. Zebley, 493 U.S. 521 (1990), as follows:

* * *

> Pursuant to his statutory authority to implement the SSI Program, (footnote omitted) the Secretary has promulgated regulations creating a five-step test to determine whether an *adult* claimant is disabled. Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). (footnote omitted). The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work. See 20 C.F.R. §§ 416.920(a) through (c)(1989). In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A)(1989). If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry. § 416.920(d). If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits.

* * *

493 U.S. at 525-26.

The claimant bears the burden of establishing steps one through four of the sequential evaluation process for making disability determinations. At step five, the burden shifts to the Commissioner to consider "vocational factors" (the claimant's age, education and past work experience) and determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy in light of his or her RFC. Ramirez v. Barnhart, 372 F.2d 546, 550-51 (3d Cir.2004).

With respect to the ALJ's application of the five-step sequential evaluation process in the present case, steps one and two were resolved in Plaintiff's favor: that is, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability,[33] and the medical evidence established that Plaintiff suffers from the following severe impairments: lupus erythemtosus, Crohn's disease, rheumatoid arthritis, high blood pressure, major depressive disorder, recurrent without psychotic features, and generalized anxiety disorder. (R. 11). Turning to step three, the ALJ found that Plaintiff's impairments were not sufficiently severe to meet or equal the requirements of any impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1. Therefore, Plaintiff was not per se disabled. (R. 12-13).

---

[33] See footnote 5.

Before proceeding to step four, the ALJ assessed
Plaintiff's RFC, concluding that Plaintiff retained the RFC to
perform sedentary work with the following limitations:[34] (1) only
occasional balancing, crouching, crawling, squatting, kneeling
and climbing ramps and stairs; (2) only occasional interaction
with supervisors, co-workers and the public; (3) only simple,
work-related decisions and routine, repetitive tasks; (4) only
infrequent changes in the work setting; and (5) no constant
handling or use of the fingers.  (R. 14-18).  The ALJ then
proceeded to step four, finding that in light of Plaintiff's
RFC, he is unable to perform any of his past relevant work.  (R.
18).

At the final step, considering Plaintiff's age, education,
work experience, RFC and the VE's testimony, the ALJ found that
Plaintiff could perform other work existing in the national
economy, including the sedentary jobs of a document preparer, a
surveillance system monitor and a telephone quotation clerk.
Thus, Plaintiff was not disabled for purposes of DIB and SSI.
(R. 18-19).

---

[34] For purposes of Social Security disability claims, sedentary work "involves
lifting no more than 10 pounds at a time and occasionally lifting or carrying
articles like docket files, ledgers, and small tools.  Although a sedentary
job is defined as one which involves sitting, a certain amount of walking and
standing is often necessary in carrying out job duties.  Jobs are sedentary
if walking and standing are required occasionally and other sedentary
criteria are met.  20 C.F.R. §§ 404.1567(a) and 416.967(a).

**VI. STANDARD OF REVIEW**

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

**VII. DISCUSSION**

**A**

The listing of impairments in Part 404, Subpart P, Appendix 1 of the Social Security Regulations describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education or work experience. 20 C.F.R. §§ 404.1525(a) and 416.925(a). In step three of the sequential evaluation process, the Commissioner evaluates whether the evidence establishes that the claimant suffers from a listed impairment.

If so, the claimant is automatically eligible for Social Security disability benefits. 20 C.F.R. §§ 404.1520(d) and 416.920(d); Bowen v. Yuckert, 482 U.S. 137, 141 (1987)("If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.").

"For a claimant to show his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir.2004), *quoting*, Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

With respect to Plaintiff's physical impairments which the ALJ found to be severe, i.e., lupus, Crohn's disease, rheumatoid arthritis and high blood pressure, the ALJ in his decision concluded that "[t]he medical evidence of record does not contain the objective signs, symptoms, or findings, nor the degree of functional restriction, necessary for the claimant's impairments, considered singly or in combination, to meet or medically equal in severity any section of the ... Listings." (R. 12). Plaintiff asserts that the ALJ erred by failing to find that his medical conditions meet Listings 5.06, 14.02 and 14.09. After consideration, the Court does not agree.

Section 5.00 of the listing of impairments relates to disorders of the digestive system. To meet Listing 5.06, a

claimant must establish, among other things, inflammatory bowel disease ("IBD") "documented by endoscopy, biopsy, appropriate medically acceptable imaging, or operative findings." The medical evidence in Plaintiff's file does not include a diagnosis of IBD based on any of the enumerated tests or on operative findings. The first reference to Crohn's disease is found in the records pertaining to Plaintiff's hospitalization in April 2008 for chest pain. Specifically, at the time of admission, Plaintiff reported a history of Crohn's disease and recent weight loss. Due to a lack of documentation, the admitting physician noted a "questionable history of Crohn's disease." (R. 312). Subsequently, Dr. Punukollu evaluated Plaintiff, included "suspected" Crohn's disease among Plaintiff's diagnoses and advised Plaintiff to undergo various tests. While Plaintiff did undergo the small bowel series recommended by Dr. Punukollu in June 2008, the impression was described as "[r]apid transit, otherwise normal small bowel series," and there is no evidence that Plaintiff ever rescheduled the recommended endoscopy with Dr. Punukollu that he cancelled in June 2008 or that he ever scheduled the recommended colonoscopy. In sum, the medical evidence submitted by Plaintiff in support of his applications for DIB and SSI fails to meet the initial requirements of Listing 5.06. Therefore,

the ALJ's determination that he did not meet this listing was not erroneous.

Section 14.00 of the listing of impairments pertains to immune system disorders. Listing 14.02 provides:

14.02 *Systemic lupus erythematosus*. As described in 14.00D1. With:

A. Involvement of two or more organs/body systems, with:

1. One of the organs/body systems involved to at least a moderate level of severity; and
2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

or

B. Repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

1. Limitation of activities of daily living.
2. Limitation in maintaining social functioning.
3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

In support of the claim that he meets this listing, Plaintiff asserts: "Plaintiff meets the A & B Criteria of Listing Section 14.02 by having rheumatoid arthritis and Crohn's Disease with malaise and involuntary weight loss. At the marked level, Dr. Groves opined that Plaintiff has marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence or pace." (Document No.

10, p. 13). After consideration, the Court finds Plaintiff's argument unpersuasive.

With respect to the first requirement of the A Criteria of Listing 14.02, i.e., the involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity, Plaintiff's "suspected" lupus or rheumatoid arthritis and Crohn's disease are not confirmed by the medical evidence submitted by Plaintiff in support of his applications for DIB and SSI. Moreover, the sparse evidence of medical treatment for these suspected conditions during the relevant time period undermines a finding that any of the conditions was of "moderate severity."

As to Plaintiff's claim that he meets the second requirement of the A Criteria of Listing 14.02, i.e., at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight), the only references to complaints of malaise or fatigue by Plaintiff appear in the office notes of visits with Dr. Meyers on June 21, 2005 and August 8, 2005. (R. 384, 396). During his office visit with Dr. Meyers on October 3, 2005, Plaintiff reported feeling well (R. 398), and the only office notes of Dr. Gavin in the record, which were completed in connection with Plaintiff's office visit on May 13, 2008, do not mention a complaint of malaise or fatigue. In fact, Dr. Gavin described Plaintiff's general

appearance during that office visit as "[h]ealthy appearing individual in no distress." (R. 410). With respect to weight loss, Plaintiff did not experience the significant weight loss until early 2008, shortly before his hospitalization for chest pain. Plaintiff's complaints of malaise or fatigue and weight loss were separated by several years. Under the circumstances, Plaintiff also has failed to establish the second requirement of the A Criteria of Listing 14.02.

With regard to the B Criteria of Listing 14.02, i.e., repeated manifestations of lupus with at least two of the constitutional symptoms (severe fatigue, fever, malaise, or involuntary weight loss), Plaintiff, again, has failed to submit medical evidence from which a finding of repeated manifestations of lupus and the presence of at least two of the constitutional symptoms in close proximity could be found. See Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir.1992)(Under the Social Security Act, the burden is on the claimant to demonstrate by medical evidence that he is unable to work). Accordingly, the ALJ did not err in finding that Plaintiff did not meet Listing 14.02.

Finally, Plaintiff contends that he meets the B Criteria of Listing 14.09 which provides:

> 14.09 *Inflammatory arthritis*. As described in 14.00D6. With:

*   *   *

        B. Inflammation or deformity in one or more major
peripheral joints with:
        1. Involvement of two or more organs/body systems with
one of the organs/body systems involved to at least a
moderate level of severity; and
        2. At least two of the constitutional symptoms or
signs (severe fatigue, fever, malaise, or involuntary
weight loss).

*   *   *

Plaintiff maintains that he meets Listing 14.09B for the

same reasons he alleges meeting the A Criteria of Listing 14.02,

*i.e.,* rheumatoid arthritis and Crohn's disease with malaise and

involuntary weight loss. For the reasons discussed above in

connection with the A Criteria of Listing 14.02, the Court

rejects this argument. In addition, the Court notes that

Plaintiff has failed to submit evidence showing inflammation or

deformity in one or more of his major peripheral joints. Under

the circumstances, the ALJ did not err in failing to find that

Plaintiff meets Listing 14.09.

One final point needs to be addressed with respect to

Plaintiff's listings argument. Citing the decision of the Court

of Appeals for the Third Circuit in Burnett v. Commissioner of

Soc. Sec., 220 F.3d 112 (3d Cir.2000), Plaintiff also argues

that the ALJ's step three analysis was deficient because he

failed to identify and discuss specific listings. (Docket No.

10, p. 14). The Court does not agree.

In <u>Burnett</u>, the claimant contended, among other things, the ALJ erred by making only a conclusory statement that he did not meet any of the listed impairments without mentioning any specific listed impairment or explaining his reasoning. The Third Circuit agreed, holding that the ALJ's conclusory statement in that case was beyond meaningful judicial review.

As noted by the Commissioner, however, in <u>Jones v. Barnhart</u>, 364 F.3d 501 (3d Cir.2004), a more recent decision, the Third Circuit held that the failure of an ALJ to analyze a specific listed impairment did not require a remand of the case for further proceedings. The Third Circuit stated:

                              *    *    *

> To be sure, in <u>Burnett v. Commissioner of Social Security Administration</u> we required "the ALJ to set forth the reasons for his decision," and held that the ALJ's bare conclusory statement that an impairment did not match, or is not equivalent to, a listed impairment was insufficient. 220 F.3d 112, 119-20 (3d Cir.2000). Here, Jones does not specifically challenge the ALJ's ruling on the grounds that it fails the <u>Burnett</u> standard. Rather, Jones's only reference to <u>Burnett</u> appears in a long list of citations in support of the general proposition that "the ALJ must analyze *all the evidence in the record* and provide an adequate explanation for disregarding evidence."... In any event, the ALJ's step three analysis in this case satisfies <u>Burnett</u>. <u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of <u>Burnett</u> is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review. <u>See</u> <u>id</u>. at 120. In this case, the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that Jones did not meet the requirements for any listing, including Listing 3.02(A). The ALJ's opinion discusses the evidence

pertaining to chronic obstructive and restrictive lung
disease, specifically referencing "[p]ulmonary function
studies ... consistent with moderately severe obstructive
and restrictive defects," but pointing to the lack of
pulmonary complications, and a finding that claimant's
lungs were clear. Also, the ALJ noted that claimant's
medical history showed no frequent hospitalization or
emergency treatments.... This discussion satisfies
Burnett's requirement that there be sufficient explanation
to provide meaningful review of the step three
determination.

\* \* \*

364 F.3d at 504-05.[35]

Similarly, in the present case, the ALJ's decision, read as

a whole, shows that he considered the appropriate factors in

concluding that Plaintiff did not meet the requirements of any

listed impairment in the Social Security Regulations.

Specifically, the ALJ noted the following: (1) the failure of

Plaintiff's course of treatment to support his subjective

allegations of disabling symptoms (R. 16); (2) Plaintiff's

normal physical examination by Dr. Johnson in June 2007 and the

consultative examiner's assessment of Plaintiff's ability to

engage in physical work-related activities (R. 15); (3)

Plaintiff's alleged history of Crohn's disease "with no apparent

work up done thus far" (R. 14); (4) the records of Plaintiff's

hospitalization in April 2008 noting Plaintiff's "questionable"

---

[35] See also Scuderi v. Commissioner of Soc. Sec., 302 Fed.Appx. 88, 90 (3d Cir.
2008) ("[A]n ALJ need not specifically mention any of the listed impairments
in order to make a judicially reviewable finding, provided that the ALJ's
decision clearly analyzes and evaluates the relevant medical evidence as it
relates to the Listing.").

history of Crohn's disease and lupus (R. 15); (5) Plaintiff's

essentially normal physical examination by Dr. Gavin in May 2008

(R. 14); (6) the normal results of the MRI of Plaintiff's brain

and the CT scan of Plaintiff's abdomen and pelvis in May 2008

(R. 14; (7) the normal small bowel series in June 2008 (R. 15);

(8) the cancellation of the endoscopy that had been scheduled

with Dr. Punukollu in June 2008 (R. 15); and (9) the routine and

conservative nature of Plaintiff's medical treatment (R. 16).[36]

In sum, the Court concludes that the ALJ's discussion of the

foregoing evidence satisfies <u>Burnett</u>'s requirement of a

sufficient explanation to provide meaningful review of the ALJ's

step three determination.

B

Plaintiff also asserts that the ALJ erroneously assessed

his RFC and, therefore, the testimony of the VE in response to

the ALJ's hypothetical question which was based on the erroneous

RFC assessment does not constitute substantial evidence

supporting the denial of his applications for DIB and SSI.

<u>Chrupcala v. Heckler</u>, 829 F.2d 1269 (3d Cir.1987)(If an ALJ

poses a hypothetical question to a vocational expert that fails

to reflect "all of a claimant's impairments that are supported

---

[36] The Court notes that the medical evidence submitted by Plaintiff also is
insufficient to show that the combination of his impairments is equivalent to
a listed impairment. To meet this burden, it was incumbent upon Plaintiff to
present medical findings equal in severity to <i>all</i> the criteria for the one
most similar listed impairment. <u>See</u> <u>Sullivan v. Zebley</u>, 493 U.S. at 531
(emphasis in original). Clearly, he has not met this burden.

by the record, ... it cannot be considered substantial evidence.").

In his decision, the ALJ noted that Plaintiff has a "moderate limitation in concentration, persistence or pace." (R. 13). The ALJ's RFC assessment, and, consequently, his hypothetical question to the VE, however, did not specifically include this limitation. Rather, the VE was asked to assume a hypothetical person who is limited, in relevant part, to (1) only occasional interaction with supervisors, coworkers and the public; (2) work requiring only simple work-related decisions; (3) work involving only routine, repetitive tasks; and (4) work in a setting that did not change frequently. Citing the Third Circuit's decision in Ramirez v. Barnhart, 372 F.3d 546 (3d Cir. 2004), Plaintiff contends that the foregoing limitations do not adequately account for the ALJ's determination that he suffers from moderate limitations in concentration, persistence or pace. Therefore, the ALJ's step five determination is not supported by substantial evidence.

In Ramirez, the disability claimant's applications for DIB and SSI were denied a second time by an ALJ following a remand by the Appeals Council for further proceedings, and the district court affirmed the Commissioner's decision. On appeal, Ramirez contended, among other things, that the ALJ's hypothetical question to the VE on which the ALJ relied heavily in denying

31

Social Security benefits to Ramirez did not adequately incorporate the ALJ's findings in the Psychiatric Review Technique Form ("PRTF") which was attached to the adverse decision.[37] Specifically, in the section of the PRTF entitled "Functional Limitation and Degree of Limitation," the ALJ indicated that Ramirez "often" experienced "deficiencies of concentration, persistence, or pace resulting in a failure to complete tasks in a timely manner (in work settings and elsewhere)."[38] The ALJ's hypothetical question to the VE, however, did not specifically include this limitation. Based on this omission, Ramirez asserted that the ALJ's adverse decision which was based, in large part, on the VE's testimony that Plaintiff could engage in work existing in the national economy despite her impairments was not supported by substantial evidence.

In opposition to Ramirez's argument, the Commissioner asserted that the ALJ's inclusion in the hypothetical question of a limitation to work involving "simple one to two step tasks" was sufficiently descriptive to encompass the ALJ's finding in the PRTF that Ramirez "often" experienced "deficiencies of

---

[37] Under the then-existing Social Security Regulations, a PRTF had to be completed by an ALJ and attached to his or her decision in cases in which claimants alleged mental impairments. 372 F.3d at 549.

[38] In the PRTF, four broad areas of functioning, i.e., (1) activities of daily living, (2) social functioning, (3) concentration, persistence or pace and (4) decompensation in work or work-like settings, were rated on a five-point scale of never, seldom, often, frequent and constant. 372 F.3d at 552.

concentration, persistence, or pace resulting in a failure to complete tasks in a timely manner (in work settings and elsewhere)." The Third Circuit disagreed, vacated the district court's decision and remanded the case to the Commissioner for further proceedings.

In 2000, the Social Security Regulations pertaining to mental impairments were revised and evaluation of the broad functional area of concentration, persistence, or pace was changed from the five-point "frequency" scale that had been applicable at the time of the Ramirez decision, *i.e.* never, seldom, often, frequent and constant, to a five-point "severity" scale consisting of none, mild, moderate, marked and severe. See Colon v. Barnhart, 424 F.Supp.2d 805, 811-12 (E.D.Pa.2006). Noting cases holding that "often" and "moderate" fall on the same point of the five-point scales utilized to evaluate functional limitations in PRTFs and, therefore, can be considered equivalent findings, Plaintiff asserts that the ALJ's hypothetical question in this case was deficient under Ramirez. (Document No. 10, pp. 14-16).

After consideration, the Court finds the Third Circuit's decision in Ramirez distinguishable. First, as noted above, the ALJ's decision in Ramirez was rendered when the Social Security Regulations required ALJs to complete PTRFs and attach them to their decisions. Thus, the ALJ herself specifically rendered

the opinion in a PTRF that Ramirez "often" experienced "deficiencies of concentration, persistence, or pace resulting in a failure to complete tasks in a timely manner." 372 F.2d at 549. There is no such PRTF in this case. Second, the limitation set forth in the PRTF in Ramirez was more extensive than the limitation noted in this case. Specifically, the limitation in the PRTF in Ramirez included deficiencies of concentration, persistence or pace "resulting in a failure to complete tasks in a timely manner (in work settings and elsewhere)." In this case, the ALJ's finding at issue is not as broad; that is, it does not address the issue of completing tasks in a timely manner. Third, in Ramirez, the ALJ's finding in the PRTF regarding the extent of the limitation in Plaintiff's concentration, persistence or pace was consistent with all of the opinions rendered by mental health professionals, including a psychological evaluator, a State agency psychologist and a Board certified psychiatrist. In contrast, the State agency psychological consultant in this case rendered the opinion in a PRTF completed on July 15, 2008 that Plaintiff's limitations with respect to concentration, persistence or pace were "mild."[39] Fourth, the limitations

[39] Although Dr. Groves, who performed the consultative psychological evaluation of Plaintiff on December 1, 2009, indicated that Plaintiff had "marked" limitations in concentration, persistence or pace, the ALJ adequately explained his reason for rejecting her opinions. Specifically, Dr. Grove's opinions were contradicted by her own objective findings, including her GAF

34

relating to concentration, persistence or pace in the ALJ's hypothetical question to the VE in this case were more extensive than the limitation included in the ALJ's hypothetical question in Ramirez. Specifically, the hypothetical question in Ramirez merely limited the claimant to "simple one to two step tasks," while the hypothetical question in this case limited Plaintiff to (1) simple, work-related decisions, (2) routine, repetitive tasks, (3) only occasional interaction with others, and (4) infrequent changes in the work setting. Based on the evidence submitted by Plaintiff in support of her applications for DIB and SSI, the foregoing limitations were adequate.

## VIII. CONCLUSION

Although it is clear that Plaintiff suffers from severe impairments, he simply has failed to submit sufficient medical evidence to support a determination that he is disabled under the Social Security Act. Nothing precludes Plaintiff from filing new applications for DIB and SSI if, and when, he procures the necessary medical evidence.

_William L. Standish_

William L. Standish
United States District Judge

Date: July 29, 2011

---

score of 52 denoting moderate symptoms, the minimal objective findings, Plaintiff's very conservative treatment and Plaintiff's range of daily activities. (R. 18).